**MODIFY and AFFIRM; and Opinion Filed June 17, 2019.**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-18-00184-CR

**VICTOR LEE WILKS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 7**
**Dallas County, Texas**
**Trial Court Cause No. F-1641359-Y**

## MEMORANDUM OPINION
Before Justices Brown, Schenck, and Pedersen III
Opinion by Justice Brown

Following a jury trial, Victor Lee Wilks appeals his conviction for aggravated robbery. In four issues, he contends the evidence is insufficient to prove he committed the offense as a party; the trial court erred in overruling his motion for new trial based on ineffective assistance of counsel and on discovery of new evidence; and the trial court erred in quashing two subpoenas duces tecum. We modify the trial court's judgment to reflect the fine imposed by the jury and affirm the judgment as modified.

### BACKGROUND

The indictment charging appellant with aggravated robbery alleged that he "intentionally and knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause[d] bodily injury to another, JUAN DAVILA . . . by

SHOOTING THE COMPLAINANT, and [appellant] used and exhibited a deadly weapon, to-wit: A HANDGUN." *See* TEX. PENAL CODE ANN. § 29.03(a). The person who shot Davila was Bradden Braxton. At trial, Davila testified that at about 6:30 a.m. on the morning of July 25, 2016, he went to get a money order at a business called PLS on Town East near his home in Mesquite. After getting the money order, he went straight home. When he got out of his car, someone yelled, "Give me your money." Davila saw a man in a mask holding a gun. The man pointed a gun at Davila's face from about a yard away. After Davila saw the man in the mask, he also saw a black Audi with a broken headlight pass by. Davila refused to give the man his money, and they argued. The man shot Davila in the face, shattering his left jaw. Davila was hospitalized for two months as a result of the shooting.

Mesquite Police Officer Zach Embrey was one of the first people to respond to a 9-1-1 call from Davila's house. He saw Davila's vehicle in the driveway, a large amount of blood outside the car, and a trail of blood leading to the front door of the house. Davila was on the ground in front of the door. Embrey tended to Davila, and officers spoke to family members who were inside the house. After medical help arrived for Davila, Embrey and others briefly canvassed the neighborhood. A crime scene investigator, Officer Gary O'Pry, arrived to document the incident with photographs and collect evidence at the scene. Embrey stood with O'Pry while O'Pry took photos and collected evidence to preserve the scene. Embrey identified various photographs as true and accurate depictions of the crime scene and testified about what was depicted in the photos.

Over appellant's objection, Jose Romero testified for the State. Like Davila, Romero also visited the PLS store in Mesquite on the morning of July 25, 2016. Romero testified that on that day he woke up around 7 a.m. and the first thing he did was go to the PLS at Gus Thomasson and Town East Boulevard to cash a check. He left the store without any cash because "the check . . . didn't have sufficient funds." Romero went to a nearby McDonald's and then back to his

apartment complex. While Romero was still sitting in his vehicle, a man approached his truck. The man put a gun through the open window and held it close to Romero's neck. The man said, "Give me your money." When Romero responded that he did not have any money, the man said, "Yes, you have the money . . . I followed you from the place where you cash the checks." The man was wearing a black mask, and he threatened to kill Romero if Romero did not give him money. Romero again said he did not have any money, and the man shot him in the neck. When Romero managed to get out of his vehicle, the man ran off. Like Davila, Romero was also hospitalized for two months.

Detective Steven Birk, with the Mesquite Police Department, was assigned to investigate Romero's shooting, and Detective Jerry Corder was assigned to investigate Davila's shooting. Corder and Birk coordinated their investigations due to the timing and similarities in the offenses—both victims had just left PLS when they were shot. There are cameras near the PLS at the intersection of Town East Boulevard and Gus Thomasson. The detectives asked a police crime analyst to look for the victims' cars on the camera footage to see if anyone was following them. The analyst identified a black Audi with some damage to the front passenger side; the right front headlight was covered with black duct tape. On the video, police saw the Audi following Romero's vehicle, but could not tell who the driver was. Police put a picture of the Audi "out for Crime Stoppers, airing it to the media." Two days after the shootings, on July 27th, police got a tip that the Audi was at an apartment complex in Dallas. Detective Birk learned the vehicle belonged to a Victor Wilks who lived at the complex. Birk waited at a nearby business and watched for the Audi to leave the apartment complex. When Birk saw the car, he contacted undercover officers who followed it. The Audi went through the parking lot of the PLS business. Marked patrol units conducted a traffic stop of the vehicle. Appellant was driving the Audi at that time and Braxton was with him. Both men were arrested and taken into custody. When police executed a search

warrant on the Audi, they found in the trunk a loaded Glock handgun as well as two plastic masks, one blue and one black.

Following appellant's arrest, Detective Corder conducted two custodial interrogations of him on July 27th and 28th. Video recordings of the interrogations were played for the jury. On July 27th, appellant told Corder he owned the Audi and he was driving it on the morning of July 25th. His "co-defendant" Braxton was with him. Appellant indicated his co-defendant directed him to follow both victims. Appellant gave the detective details about the route he took from the PLS to Davila's house. Appellant waited in the car for Braxton each time. Appellant knew they were going to get money. He said they never discussed how Braxton was "going to do it," but appellant knew Braxton "probably wasn't going to do something good." Braxton told appellant he did not get any money from the first victim, and they then went back to the PLS. Appellant denied seeing a gun or any masks and denied hearing gunshots. When Corder told appellant he knew appellant had to have seen Braxton with a mask, appellant denied seeing Braxton get in the car. Corder testified that appellant seemed shocked to learn two people had been shot in the face.

The next day, July 28th, appellant asked to speak to Corder again. Appellant recanted his entire confession. He told Corder he was never there and that he was not in the car. Corder did not believe appellant's recantation.

Appellant's brother, Jeffrey Wright, testified for the defense about how he and appellant spent the day on July 25, 2016. Wright and appellant shared an apartment at that time, and during the early morning hours, they were home playing a video game. Wright testified they played from 6 a.m. to 10 a.m. and then went to a restaurant. Braxton occasionally stayed with them for three or four days at a time. That morning, Braxton was at the apartment, but was asleep.

Appellant testified at trial. He acknowledged that he owned the Audi, but denied any knowledge of Davila's shooting. According to appellant, on the morning of the offense, he was at

–4–

his apartment sleeping. Braxton woke him at about 6 a.m. to ask for his keys, and appellant said he could have them. Appellant testified he did not have any idea what Braxton was planning on doing that day. When appellant told the officer on July 27th that he was driving his car, he thought the officer was talking about that day, not the 25th. When asked about his brother's testimony that he and appellant were playing video games on the morning of the 25th, appellant testified that his brother gets confused about dates and other things. Appellant testified that he was on his way to get new liability insurance when police stopped him on July 27th. Braxton had asked to ride along with him. When asked if it was a coincidence that he was getting new insurance in the same parking lot as PLS, appellant denied that the businesses were located in the same lot. Appellant testified he lied when he told Corder he was in the vehicle with Braxton robbing people on July 25th. He explained that it was his military background kicking in and that the only way out of the interrogation was to say what Corder wanted to hear.

The jury charge included instructions on the law of parties. The jury found appellant guilty and assessed his punishment at eight years' confinement and a $10,000 fine. On February 9, 2018, the trial court signed a judgment of conviction. The written judgment does not include a fine.

A few days later, on February 14, 2018, one of the assistant district attorneys who prosecuted the case sent defense counsel a *Brady* notice. The Mesquite Police Department notified the Dallas County District Attorney's Office on February 13th that Officer Embrey would be resigning from the department after it was discovered that he forged a signature on a request to remove evidence from the property room for destruction in another case. The information was revealed when the officer took a polygraph test as part of his application for employment with a police department in another state.

Appellant moved for new trial on two grounds. First, he alleged he was entitled to a new trial due to the newly discovered evidence about Officer Embrey. Second, appellant argued that

he received ineffective assistance of counsel during the punishment phase of trial. Specifically, appellant asserted his defense counsel did not investigate and present evidence of appellant's "evaluation, mental health diagnosis, and treatment plan by the United States Department of Veterans Affairs." The trial court held a hearing on the motion, and the motion was overruled by operation of law. This appeal followed.

SUFFICIENCY OF THE EVIDENCE

In his first issue, appellant contends the evidence is insufficient to support the jury's guilty verdict. He argues the evidence is insufficient to show he is criminally liable as a party to the offense. He asserts the State did not prove beyond a reasonable doubt that he acted with intent to promote or assist in the crime.

A person commits aggravated robbery if he commits robbery as defined in section 29.03 of the penal code and the State proves an aggravating element. TEX. PENAL CODE ANN. §§ 29.02, 29.03. In this case, the aggravating element was using or exhibiting a firearm. *See id.* § 29.03(a)(2). The law of parties authorizes conviction for the collective conduct of two or more people. *Johnson v. State*, 560 S.W.3d 224, 229 (Tex. Crim. App. 2018). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE ANN. § 7.02(a)(2). Section 7.02(a)(2) requires evidence that the defendant intended commission of the crime and did something to help the other commit it. *Johnson*, 560 S.W.3d at 230–31. Without evidence of intentional participation by the accused, an accused may not be convicted under the law of parties. *Cary v. State*, 507 S.W.3d 750, 758 (Tex. Crim. App. 2016). The necessary specific intent can be proven through circumstantial evidence, and we may rely on events that took place before, during, or after the commission of the crime. *Id.* Where the use of a deadly weapon is an element of the offense, to

convict a defendant for aggravated robbery as party, the State has the burden to prove the defendant knew a weapon would be used or exhibited in the commission of the offense. *Sarmiento v. State*, 93 S.W.3d 566, 570 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd); *see Boston v. State*, 373 S.W.3d 832, 839 n.7 (Tex. App.—Austin 2012), *aff'd*, 410 S.W.3d 321 (Tex. Crim. App. 2013).

When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine, whether, based on that evidence and the reasonable inferences therefrom, the factfinder was rationally justified in finding guilt beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Temple*, 390 S.W.3d at 360.

Appellant does not dispute that Braxton committed aggravated robbery. His sole challenge to the sufficiency of the evidence is that the State did not prove he himself acted with intent to promote or assist in the crime. He argues his initial statement to Corder showed only his presence near the crime scene and not his intent to aid the crime. Appellant also argues the State did not prove he knew of the offense before or when it was committed.

Contrary to appellant's argument, the State's evidence proved more than appellant's mere presence at the scene of the aggravated robbery against Davila. The evidence, including circumstantial evidence, showed that appellant was a full participant in the plan to follow Davila from the PLS and use a gun to rob him. Appellant told police he was with Braxton and was driving the car when the offenses against Davila and Romero occurred. He admitted that Braxton instructed him to follow Davila. Appellant knew they were going to get money and knew Braxton was not going to do "something good." After they did not get any money from Davila, appellant followed another car from the PLS at Braxton's instruction. Two days after Davila was shot, appellant and Braxton again drove together to the PLS parking lot. The masks and gun used by

Braxton were found in the trunk of appellant's car.  Appellant's testimony at trial was inconsistent.  He testified that when he told Corder he was driving he was confused about the date.  He also testified that he lied to Corder, telling him what he wanted to hear.  Further, the jury could infer appellant's intent from the fact that he initially told Corder he was the driver of the car and later changed his story to deny that he was there.  *See Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1999, pet. ref'd).  The jury was free to believe appellant's statements to Corder indicating his participation in the crime and reject his later statements to the contrary.  The jury was also free to find it implausible that appellant could have dropped Braxton off at the two robberies and waited to pick him up, but not have been aware that Braxton used a gun and a mask, especially since these items were still in his car when he was arrested later in the vicinity of the PLS.  We conclude the evidence is legally sufficient to prove appellant acted with intent to promote or assist in the aggravated robbery.  We overrule appellant's first issue.

**MOTION FOR NEW TRIAL**

In his second and third issues, appellant contends the trial court erred in denying his motion for new trial.  Appellant first contends he was entitled to a new trial because trial counsel was ineffective for failing to investigate his mental health history and offer his records from the Department of Veteran's Affairs into evidence during the punishment phase.  At the hearing on the motion for new trial, appellant presented the judge with seventy-two pages of records from the VA hospital.  Appellant contends these records reflect many facts that would have been mitigating during the punishment phase.

**Ineffective Assistance of Counsel**

We review a claim of ineffective assistance of counsel using the two-part analysis set out in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  First, an appellant must show that counsel's performance was deficient.  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  To establish

–8–

deficient performance, an appellant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.* Second, an appellant must show the deficiency prejudiced the defense. *Id.* To establish prejudice, a defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 534. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

When an appellant presents his ineffective assistance claim to the trial court in a motion for new trial, an appellate court analyzes this issue as a challenge to the denial of the motion for new trial. *See Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004), *superseded by statute as stated in State v. Herndon*, 215 S.W.3d 901 (Tex. Crim. App. 2007). As such, an appellate court reviews the *Strickland* test through an abuse of discretion standard. We do not substitute our judgment for the trial court's, but rather we decide whether the trial court's resolution of the ineffective assistance claim was arbitrary or unreasonable. *Id.* We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party. Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.*

Appellant's trial counsel testified at the hearing on appellant's motion for new trial. Appellant told counsel he had been diagnosed with post-traumatic stress disorder and said he was a patient at the VA hospital. Counsel testified that from his past experience, the VA hospital is quite strict about releasing records due to the HIPAA act. Counsel told appellant that if "he had anything that he wanted me to look at, [I'd] be happy to look at it." Counsel told appellant that it would be much easier for appellant to get the records himself. Counsel testified he was not aware of certain things that were in the VA records. For example, counsel was not aware appellant had

been diagnosed with major depressive disorder by the VA or that he was prescribed Sertraline for mood and anxiety by the VA. Counsel was not aware that appellant's two sisters had died—one during the same year the offense was committed. Counsel was also not aware that appellant's mother died when he was three years old and the VA reported her death was a major cause of his depression. Counsel was not aware that the VA had referred appellant to outpatient therapy. Nor was counsel aware that in 2018, some people had called to report a concern appellant might be suicidal. Counsel testified that appellant chose not to share a lot of information with him. The records did not show that appellant had been diagnosed with PTSD.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins*, 539 U.S. at 521. In this case, we need not consider the constitutional adequacy of defense counsel's investigation because appellant has failed to show prejudice. Assuming without deciding that defense counsel's performance was deficient for failing to investigate, appellant has failed to establish that had counsel reasonably investigated and presented appellant's VA records at trial, there is a reasonable probability the jury would have returned a different sentence.

Four witnesses testified for the State at the punishment hearing, which took place on Friday, February 9, 2018. Davila and Romero each testified about how the incident and their injuries affected their lives. Dallas Police Officer Jacob Holmes testified about stopping appellant for a traffic violation earlier that week—on Monday night February 5, 2018—and learning he had a warrant out for his arrest due to a bond forfeiture. Appellant told them he had missed court for the aggravated robbery charge because he "decided to sleep." Also, a probation officer explained the probation process to the jury.

–10–

Appellant's father was the sole punishment witness for the defense. He testified his son should get probation because he had never been in any trouble before. Appellant's punishment argument emphasized the fact that appellant was a military veteran and had no prior convictions.

The VA hospital records contain some potentially mitigating evidence, such as evidence appellant had been diagnosed with and medicated for major depressive disorder and had some difficult family circumstances. However, the records also contain evidence that was potentially aggravating, including evidence of appellant's daily marijuana use, the fact that he showed up under the influence at the hospital, and evidence that he stole a third party's car and demanded $1,000 for it. In addition, appellant was treated at the VA hospital well after the commission of the instant offense. He first visited the VA hospital in December 2017. At the time, he was out on bond for the aggravated robbery charge, which occurred in July 2016. The hospital records indicate his most recent "mood episode" started while he was incarcerated as a result of this offense. Further, based on the records, appellant's treatment at the VA hospital was limited and short-lived. After his first visit in early December 2017, he was given a provisional diagnosis of major depressive disorder. He was seen again later in December and assigned to an outpatient team. In early January 2018, a responder at the veterans' crisis line reached out to appellant after a third party expressed concerns he was suicidal. Appellant denied having suicidal thoughts. Later in January, he was seen at a VA clinic for assistance with housing. In February 2018, appellant did not show up for an appointment at the hospital.

We are not persuaded by appellant's argument that evidence he visited the VA hospital to participate in mental health treatment would have given the jury a reason to consider appellant for probation. Nor are we persuaded by appellant's argument that evidence of his depression was material because it would have corroborated his statement to police about sleeping in when he was due to appear for trial. A determination that appellant did not show a reasonable probability that

–11–

the result of the punishment phase would been different if the jury had his VA hospital records is within the zone of reasonable disagreement. We conclude the trial court acted within its discretion in failing to grant appellant a new trial based on ineffective assistance of counsel. *See State v. Frias*, 511 S.W.3d 797, 812–16 (Tex. App.—El Paso 2016, pet. ref'd) (failure to investigate client's mental health issues was unreasonable, but defendant did not meet burden to establish prejudice). We overrule appellant's second issue.

**Discovery of New Evidence**

In his third issue, appellant contends the trial court erred in denying his motion for new trial based on the discovery of new evidence regarding Officer Embrey. We review a trial court's decision to deny a motion for new trial based on newly discovered evidence for an abuse of discretion. *See Jones v. State*, 711 S.W.2d 35, 36 (Tex. Crim. App. 1986). Generally, the discovery after trial of new evidence material to the defendant constitutes a ground for new trial. TEX. CODE CRIM. PROC. ANN. art. 40.001; *Drew v. State*, 743 S.W.2d 207, 226 (Tex. Crim. App. 1987). The requirements for obtaining a new trial upon newly discovered or available evidence are: (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the evidence was not due to his lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the evidence is probably true and will probably bring about a different result in a new trial. *Carsner v. State*, 444 S.W.3d 1, 2–3 (Tex. Crim. App. 2014).

We will assume without deciding that the evidence would have been admissible and not merely impeaching. We will focus our analysis in this case on requirement four—whether the newly discovered evidence would probably bring about a different result in a new trial. Appellant maintains it would. He contends evidence that Officer Embrey forged a request to remove evidence from the evidence room for destruction in another case was relevant to his integrity and

credibility regarding the preservation of evidence at the crime scene in this case. He argues the evidence was material because it was "relevant to Officer Embrey's activities when first arriving at the crime scene . . . and maintaining the scene until other officers arrived." We conclude it was within the trial court's discretion to determine there was not a probability the outcome of the trial would have been different. Officer Embrey was one of the first to respond to the scene of Davila's shooting. His involvement included tending to Davila, briefly canvassing the neighborhood, and standing with the crime scene investigator O'Pry as O'Pry took photos and collected evidence. At trial, Embrey identified various photographs as true and accurate depictions of the crime scene. O'Pry also testified at trial because he conducted the search of appellant's car and could have identified the photographs he took. There is nothing to suggest Embrey acted improperly in this case. Even so, the evidence collected at Davila's house was not in dispute and had very little to do with the State's proof appellant committed aggravated robbery. Instead, the State's case turned on the video taken at the intersection near the PLS that showed appellant's Audi following the second victim Romero, the masks and gun found in appellant's car, and appellant's confession to Detective Corder that he drove the car. The trial court did not abuse its discretion in denying appellant's motion for new trial on the basis of newly discovered evidence. *See Jones*, 711 S.W.2d at 37 (trial court is within its discretion to deny motion for new trial where it appears newly discovered evidence would not probably bring about a different result). We overrule appellant's third issue.

### MOTION TO QUASH

Appellant's fourth issue also involves the information revealed about Officer Embrey after trial. On February 23, 2018, after the State's *Brady* notice to defense counsel, appellant filed two applications for subpoenas duces tecum. In issue four, appellant contends the trial court erred in quashing the subpoenas. The applications were directed to "Sergeant Cumming of the Mesquite

Police Department" and the custodian of records for the City of Mesquite Human Resources. Appellant sought the production of "[a]ny and all records, documents, reports, complaints and/or recordings concerning Officer Z. Embrey #1120, including but not limited to: Any and all written and/or electronic materials, to wit: concerning Officer Embrey forging any requests to remove evidence from any property room for destruction." The City of Mesquite moved to quash the subpoenas for various reasons and proposed to produce for in camera inspection a copy of the Mesquite Police Department's internal affairs file pertaining to Officer Embrey. The trial court reviewed the file in camera and ruled that appellant was not entitled to the records because there was no additional information in them relevant to the motion for new trial. The trial court granted the City's motion to quash.

We review a trial court's ruling on a motion to quash for an abuse of discretion. *Torres v. State*, 424 S.W.3d 245, 261–62 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). Article 24.02 of the code of criminal procedure provides for a subpoena duces tecum as follows: "If a witness have in his possession any instrument of writing or other thing desired as evidence, the subpoena may specify such evidence and direct that the witness bring the same with him and produce it in court." TEX. CODE CRIM. PROC. ANN. art. 24.02. The right of compulsory process, however, is not absolute. *Torres*, 424 S.W.3d at 262. A defendant bears the burden of a plausible showing that the evidence would be material and favorable. *Id.*

Officer Embrey's internal affairs file has been included in the appellate record under seal. We have reviewed the file and conclude the trial court did not abuse its discretion in quashing the subpoenas. There is little additional information in the documents about Embrey's forgery. As described by appellant in his brief, the records reveal "the date of the forged request, which was in 2017, the type of case in which it took place, and the proper procedure for the request and how Officer Embrey violated that procedure." Appellant's argument for why this additional

–14–

information is material is the same his argument in connection with his request for a new trial. He contends it was relevant to Embrey's activities when arriving at the crime scene and maintaining the scene. As discussed above in connection with issue three, appellant cannot show the newly discovered evidence about Officer Embrey would probably bring about a different result in a new trial. In other words, the information was not material to the case. The same is true for the slight amount of new information in Embrey's internal affairs file. We overrule appellant's fourth issue.

### STATE'S CROSS POINT

In a cross point, the State asks this Court to modify the trial court's judgment to accurately reflect that appellant's sentence included a $10,000 fine. The judgment shows the fine assessed as "N/A." However, the jury assessed a $10,000 fine. The jury's lawful verdict must be imposed as the trial court's judgment. *Ette v. State*, 559 S.W.3d 511, 517 (Tex. Crim. App. 2018). This Court may modify the trial court's judgment to make the record speak the truth when it has the necessary data and information to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–8 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we modify the judgment to show that the fine assessed is $10,000. *See Ette*, 559 S.W.3d at 517. We sustain the State's cross point.

As modified, we affirm the trial court's judgment.


/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish.
TEX. R. APP. P. 47.2(b).

180184F.U05

–15–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

VICTOR LEE WILKS, Appellant

No. 05-18-00184-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 7, Dallas County, Texas
Trial Court Cause No. F-1641359-Y.
Opinion delivered by Justice Brown,
Justices Schenck and Pedersen III
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

Following the word "<u>Fine:</u>" we delete "$ N/A" and in its place insert "$10,000."

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 17th day of June, 2019.